## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARLOS O. NESBETH, AMIT GODAMBE, JENNY GALLERY, MISTY HOWELL and MICAH WEBB, individually and on behalf of all others similarly situated, ) ) ) ) ) | **CIVIL ACTION NO.:** |
| Plaintiffs, ) ) | |
| v. ) ) | **CLASS ACTION COMPLAINT** |
| ICON CLINICAL RESEARCH, LLC, THE BOARD OF DIRECTORS OF ICON CLINICAL RESEARCH, LLC, THE 401(K) PLAN COMMITTEE OF ICON CLINICAL RESEARCH, LLC and JOHN DOES 1-30. ) ) ) ) ) ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiffs, Carlos O. Nesbeth, Amit Godambe, Jenny Gallery, Misty Howell and Micah Webb ("Plaintiffs"), by and through their attorneys, on behalf of the ICON Clinical Research, LLC 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include ICON Clinical Research, LLC. ("ICON" or "Company") and the Board of Directors of ICON Clinical Research, LLC and its members during the Class Period[2]

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as March 26, 2015 through the date of judgment.

("Board") and the 401(k) Plan Committee of ICON Clinical Research, LLC and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 16, 2021) ("You should be

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.       Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.      At all times during the Class Period (March 26, 2015 through the date of judgment) the Plan had at least 280 million dollars in assets under management.  At the end of 2018 and 2019, the Plan had over 408 million dollars and 523 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

10.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses

---

aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's administrative and recordkeeping costs.

12.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.      JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

**Plaintiffs**

17.     Plaintiff, Carlos O. Nesbeth ("Nesbeth"), resides in Washington, D.C. During his employment, Plaintiff Nesbeth participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

18.     Plaintiff, Amit Godambe ("Godambe"), resides in Malvern, Pennsylvania. During his employment, Plaintiff Godambe participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.      Plaintiff, Jenny Gallery ("Gallery"), resides in New York Mills, New York. During her employment, Plaintiff Gallery participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Plaintiff, Misty Howell ("Howell"), resides in Antioch, Tennessee. During her employment, Plaintiff Howell participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.     Plaintiff, Micah Webb ("Webb"), resides in Miami Beach, Florida. During his employment, Plaintiff Webb participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

22.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are

entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available identical funds, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

#### Company Defendant

24.     ICON is the Plan sponsor and a named fiduciary with a principal place of business being 2100 Pennbrook Parkway, North Wales, PA 19454.  The December 31, 2019 Form 5500 of the ICON Clinical Research, LLC 401(k) Plan filed with the United States Department of Labor ("2019 Form 5500") at 1.

25.      As detailed in ICON's 2019 Annual Report filed with the United States Security and Exchange Commission: ICON is "… one of the world's leading Contract Research Organizations ("CROs") … ." The December 31, 2019 Form 20-F filed with the United States Securities and Exchange Commission ("2019 20-F") at 20.  ICON defines its role as a CRO as "a global provider of outsourced development and commercialization services to pharmaceutical, biotechnology, medical device and government and public health organizations." *Id.*

26.     ICON appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The December 31, 2019 Report of Independent Auditor of the ICON Clinical Research, LLC 401(k) Plan ("2019 Auditor Report") at 3. As detailed in the 2019 Auditor Report "[t]he 401(k) Plan Committee is responsible for oversight of the Plan, determines the appropriateness of the Plan's investment offerings and monitors investment performance." *Id.* Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.     Accordingly, the Company had a concomitant fiduciary duty to monitor and supervise those appointees.

28.     Accordingly, ICON during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

**Board Defendants**

29.     ICON, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2019 Auditor Report at 3. As detailed in the 2019 Auditor Report "[t]he 401(k) Plan Committee is responsible for oversight of the Plan, determines the appropriateness of the Plan's investment offerings and monitors investment performance." *Id.* Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

30.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section

3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

31.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### Committee Defendants

32.      As discussed above, the Committee ensures that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2019 Auditor Report at 3. As discussed above, "[t]he 401(k) Plan Committee is responsible for oversight of the Plan, determines the appropriateness of the Plan's investment offerings and monitors investment performance." *Id.*

33.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

34.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

35.     To the extent that there are additional officers, employees and/or contractors of ICON who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30

include, but are not limited to, ICON officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between March 26, 2015 through the date of judgment (the "Class Period").

37.    The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 lists 6,762 Plan "participants with account balances as of the end of the plan year."  2019 Form 5500 at 2.

38.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

39.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

> B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;
>
> C.    Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;
>
> D.    The proper form of equitable and injunctive relief; and
>
> E.    The proper measure of monetary relief.

40.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41.    This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.      THE PLAN

43.     The Plan was established effective January 1, 1994 to help employees provide for their "financial security through a combination of personal savings, current tax savings and contributions made by your Employer." The Summary Plan Description of the ICON Clinical Research, LLC 401(k) Plan effective January April 1, 2015 ("SPD") at 3.

44.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *Id*.   Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id*.

### Eligibility

45.     In general, regular full-time employees are eligible to participate in the Plan. 2019 Auditor Report at 3. The 2019 Auditor Report states: "[t]he Plan is a participant-directed defined contribution plan covering substantially all fulltime employees of ICON Clinical Research, LLC (the Company) from the date of hire" *Id*.

### Contributions

46.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. 2019 Auditor Report at 4.

47.     With regard to employee contributions, participants may "may contribute a percentage (up to 75%) of eligible compensation, as defined, up to the annual limit established by the Internal Revenue Service (IRS)." *Id*. ICON may decide to make matching contributions to the Plan on behalf of their employees. As detailed in the 2019 Auditor Report: "[f]or the 2019 plan year, eligible participants were entitled to receive Company matching contributions equal to 100% of the first 3% of contributions and 50% of the next 3% of contributions." *Id.*

48.     Like other companies that sponsor 401(k) plans for their employees, ICON enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

49.     ICON and its clients also benefit in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

50.     Given the size of the Plan, ICON likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

51.     Participants are immediately vested in their own contributions made to the Plan. Auditor Report at 5. With regard to contributions made by ICON, participants are subject to a three year vesting schedule before those contributions are considered earned. *Id.*

*The Plan's Investments*

52.     In theory, the Committee responsibilities include selection and monitoring of the funds available for investment in the Plan.  2019 Auditor Report at 3.  The Committee must carry

out this fiduciary responsibility for the exclusive benefit of the plan participants and beneficiaries. SPD at 34.  But in practice, as alleged below, that is not what happened.

53.     Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. 2019 Auditor Report at 3.

54.     The Plan's assets under management for all funds as of December 31, 2019 was $523,879,114.  2019 Auditor Report at 1.

### Payment of Plan Expenses

55.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the 2019 Audit Report: "[t]he Plan has a revenue sharing arrangement with the record keeper and established a plan level account (ERISA account) that captures excess income collected by the record keeper … to pay eligible plan expenses" 2019 Audit Report at 6.

## VI.     THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

56.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

57.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

58.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the

Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs. Defendants also failed to monitor and curtail the unreasonable costs incurred by the Plan.

A.    **The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

(1)    **The Plan's Total Plan Costs Were the Highest in its Peer Group**

59.    "Many types of services are required to operate a [defined contribution] plan, including administrative services (*e.g*., recordkeeping and transaction processing), participant-focused services (*e.g*., participant communication, education, or advice), regulatory and compliance services (*e.g.*, plan document services; consulting, accounting, and audit services; and legal advice), and investment management." [5]

60.    "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst, "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios."  ICI Study at 55.

61.    Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return."  Vanguard's Principles for Investing Success, at 17.[6]

62.    One indication that the Plan was poorly run is its dismal ranking among peers when comparing total plan costs.  As of 2019, the Plan is ranked by BrightScope as having one of the highest overall plan costs of any Plan with over 500 million dollars in assets under management.[7]

---

[5] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

[6] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success

[7] https://www.brightscope.com/401k-rating/112914/Icon-Clinical-Research-Llc/114608/Icon-Clinical-Research-Llc-401K-Plan  last accessed on March 3, 2021.

In fact, BrightScope finds that the average participant would have to work an additional 11 years and will have lost at least $51,000 as a result of the Plan's high costs. *Id.*

63.     According to the ICI Study, the median total plan cost for a plan between 250 million dollars and 500 million dollars is 0.43% of total assets in a plan.  ICI Study at 57.  Here, the total plan costs during the Class Period ranged from a high of 0.78 in 2015 to 0.69% in 2019.  There's little question the Plan was paying at least 60% more in total plan costs than its peers.  These excessive costs should have been addressed by the Defendants during the Class Period, but, again, this is something the Defendants failed to do to the great detriment of Plan participants.

### (2)     The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period

64.     Another result of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay to the Plan's recordkeeper, Transamerica, during the Class Period.

65.     Long-standing DOL guidance explicitly states that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting … service providers" and "monitor … service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees*," *supra*, at n.3.

66.     The Restatement of Trusts also puts cost-conscious management above all else while administering a retirement plan.  *Tibble*, 843 F.3d at 1197-98.

67.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

68.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

69.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at   http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

70.     In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

71.     As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were astronomical when benchmarked against similar plans.

| Year | Participants | TA Direct | TA Indirect | Total | $PP |
|------|-------------|-----------|-------------|--------|------|
| 2019 | 6762 | $286,758 | $672,572 | $959,330 | $142 |
| 2018 | 6162 | $234,705 | $548,420 | $783,125 | $127 |
| 2017 | 5434 | $427,744 | $560,478 | $988,222 | $182 |
| 2016 | 5469 | $216,308 | $474,350 | $690,658 | $126 |
| 2015 | 5149 | $303,689 | $426,850 | $730,539 | $142 |

72.     By way of comparison, we can look at what other plans paid for recordkeeping and administrative costs during the same time period.

73.     The Plan had between 5,000 and 10,000 participants making it eligible for some of the lowest fees on the market.

74.     NEPC, a consulting group, which recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[8]  The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants.  The median plan had $512 million in assets and 5,440 participants.  *See,* Report at 1.

75.     NEPC's survey found that ***no plan*** with between 5,000 and 10,000 participants paid more than $89 per participant for recordkeeping.  Report at 10.

76.     Another data source, the *401k Averages Book* (20th ed. 2020)[9] studies plan fees for much smaller plans, those under $200 million in assets.  Although it studies smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plan should be paying for recordkeeping.  That is because recordkeeping and administrative fees should ***decrease*** as a plan increases in size. [10]

77.     Thus, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id.*, at

---

[8] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

[9] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

[10] For example, a 1998 study conducted by the Department of Labor ("1998 DOL Study") reflected that as the number of participants grow, a plan can negotiate lower recordkeeping fees.  *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

p. 108.  Thus, the Plan, with over half a billion dollars in assets and nearly 7,000 participants in 2019, should have had direct recordkeeping costs at or below the $5 average, yet if far exceeded this benchmark by multiples.

78.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

79.     Additionally, because Plan participants were paying more for recordkeeping than they should have as a result of the Plan fiduciaries' conduct, this confirms that the use of higher-cost share classes cannot be justified as a prudent means to pay recordkeeping and administrative costs via revenue sharing.

80.     Moreover, because a significant amount of the recordkeeping and administrative fees were paid for by forfeiture accounts there was no need to use revenue sharing from the Plan's investments to pay for recordkeeping and administrative fees.  But there is no indication that the Plan's fiduciaries returned the revenue sharing collected from the Plan's investments back to the Plan's participants as they should have.

### (3)     There Was Little to No Change in Plan Investment Options for the Entirety of the Class Period

81.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan retained 11 mutual funds, having more than 156 million dollars in participant assets as of 2019, as Plan investment options despite the fact that these funds charged grossly excessive fees compared with identical, comparable and/or superior alternatives, and despite ample evidence available to a reasonable fiduciary that the costs associated with these funds were imprudently high. The following funds in the Plan stayed unchanged from 2013 to 2019:

| 2019 Funds | Years in the Plan |
|---|---|
| American Funds Europacific Growth R5 | Since 2013 |
| Invesco Diversified Dividend A | Since 2013 |
| John Hancock Disciplined Value Mid Cap I | Since 2013 |
| Janus Triton I | Since 2013 |
| JPMorgan Government Bond Select | Since 2013 |
| JPMorgan Small Cap Value Select | Since 2013 |
| Metropolitan West Total Return Bond M | Since 2013 |
| PIMCO Real Estate Real Return Strategy I | Since 2013 |
| T. Rowe Price Blue Chip Growth | Since 2013 |
| T. Rowe Price Health Sciences | Since 2013 |
| T. Rowe Price Balanced Retirement Income | Since 2013 |

82.     Out of the 24 mutual funds in the Plan in 2019, 11 of them or more than 45%, remained unchanged since 2013. Failure to remove or change imprudent funds to less expensive share classes or cheaper cost structures over the course of several years is a clear indication that Defendants were not monitoring the Plan's funds as they should have been.

### (4)     Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans

83.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several of the mutual funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having between 250 million and 500 million in assets[11]). By the end of 2019, the Plan had $523,879,114 in assets.

84.     In 2019, 13 of the 24 mutual funds in the Plan were more expensive than comparable mutual funds found in similarly sized plans.  The expense ratios for funds in the Plan

_____

[11] Although the Plan exceeded 500 million dollars in 2019, the more conservative number of between 250 million and 500 million is being used here because the Plan had less than 500 million in assets under management from 2015 through 2018.

in some cases were up to *326%* (in the case of PIMCO Real Estate Real Return Strategy I) and up to *113%* (in the case of BlackRock High Yield Bond Inv A) above the median expense ratios in the same category: [12]

| ICI Median Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Median** |
| T. Rowe Price Blue Chip Growth | 0.69% | Target Date | 0.35% |
| T. Rowe Price Health Sciences | 0.76% | Domestic Equity | 0.49% |
| Metropolitan West Total Return Bd M | 0.67% | Domestic Bond | 0.44% |
| Invesco Diversified Dividend A | 0.82% | Domestic Equity | 0.49% |
| Janus Henderson Triton I | 0.76% | Domestic Equity | 0.49% |
| Voya MidCap Opportunities I | 0.96% | Domestic Equity | 0.49% |
| JPMorgan Government Bond I | 0.48% | Domestic Bond | 0.44% |
| JHancock Disciplined Value Mid Cap I | 0.86% | Domestic Equity | 0.49% |
| BlackRock High Yield Bond Inv A | 0.94% | Domestic Bond | 0.44% |
| PIMCO Real Estate Real Return Strategy I | 2.09% | Domestic Equity | 0.49% |
| JPMorgan Small Cap Value I | 0.99% | Domestic Equity | 0.49% |
| T. Rowe Price Global Technology | 0.88% | International Equity | 0.55% |
| T. Rowe Price Retirement Balanced | 0.50% | Target Date | 0.35% |

85.     The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Average** |
| T. Rowe Price Blue Chip Growth | 0.69% | Target Date | 0.39% |

---

[12] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

| ICI Average Chart | | | |
|---|---|---|---|
| **Current Fund** | **2020 Exp Ratio** | **Investment Style** | **ICI Average** |
| T. Rowe Price Health Sciences | 0.76% | Domestic Equity | 0.44% |
| Metropolitan West Total Return Bd M | 0.67% | Domestic Bond | 0.36% |
| Invesco Diversified Dividend A | 0.82% | Domestic Equity | 0.44% |
| Janus Henderson Triton I | 0.76% | Domestic Equity | 0.44% |
| Voya MidCap Opportunities I | 0.96% | Domestic Equity | 0.44% |
| JPMorgan Government Bond I | 0.48% | Domestic Bond | 0.36% |
| JHancock Disciplined Value Mid Cap I | 0.86% | Domestic Equity | 0.44% |
| BlackRock High Yield Bond Inv A | 0.94% | Domestic Bond | 0.44% |
| PIMCO Real Estate Real Return Strategy I | 2.09% | Domestic Equity | 0.44% |
| JPMorgan Small Cap Value I | 0.99% | Domestic Equity | 0.44% |
| T. Rowe Price Global Technology | 0.88% | International Equity | 0.60% |
| T. Rowe Price Retirement Balanced | 0.50% | Target Date | 0.39% |

86.    Although a good gauge of Defendants' imprudence, median-based and average-based comparisons still understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available (which Defendants failed to consider) that offered lower expenses than the median and average fees.

87.    The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2017 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for target date funds for plans with between 250 million dollars and 500 million dollars in assets was .65 using 2015 data[13] compared with .35% in 2017.  Accordingly, the median expense ratios in 2020 utilized by similar plans would be

---

[13] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69 (March 2018) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

lower than indicated above, demonstrating a greater disparity between the 2020 expense ratios utilized in the above chart for the Plan's current funds and the median expense ratios in the same category.

### (5) Several of the Plan's Funds Were Not in the Lowest Fee Share Class Available to the Plan

88.     Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

89.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.  Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  *Tibble*, 2017 WL 3523737, at * 13.

90.     Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).

91.     Here, 11 of the 24 mutual funds in the Plan or more than 45% of the funds in the Plan from 2015 to the end of 2019 were not in the lowest share class.  In 2019, the total assets under management for these funds was more than 143 million dollars thus easily qualifying them for lower share classes.  The following is a list of these funds and their assets under management as of the end of 2019:

| Current Fund | 2019 Assets Under Management |
|---|---|
| TRBCX<br>T. Rowe Price Blue Chip Growth | $37,090,663 |
| RERFX<br>American Funds Europacific Growth R5 | $28,503,775 |
| MWTRX<br>Metropolitan West Total Return Bd M | $16,110,407 |
| LCEAX<br>Invesco Diversified Dividend A | $14,616,810 |
| JSMGX<br>Janus Henderson Triton I | $9,297,217 |
| NMCIX<br>Voya MidCap Opportunities I | $8,812,355 |
| VIGAX<br>Vanguard Growth Index Admiral | $7,612,857 |
| JVMIX<br>JHancock Disciplined Value Mid Cap I | $7,597,687 |
| BHYIX<br>BlackRock High Yield Bond Instl | $7,042,215 |
| PSOPX<br>JPMorgan Small Cap Value I | $5,881,878 |
| TRRIX<br>T. Rowe Price Retirement Balanced | $1,387,351 |
| **Total:** | $143,953,215 |

92.     In several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.

93.     The below chart uses 2020 expense ratios to demonstrate cost differentials between the applicable mutual funds and the cheaper identical shares:

| Fund in the Plan | ER | Less Expensive Share Class | Less Expensive ER | Excess Cost |
|---|---|---|---|---|
| TRBCX T. Rowe Price Blue Chip Growth | 0.69 % | TBCIX T. Rowe Price Blue Chip Growth I | 0.56% | 23% |
| RERFX American Funds Europacific Growth R5 | 0.51 % | RERGX American Funds Europacific Growth R6 | 0.46 % | 11% |
| MWTRX Metropolitan West Total Return Bd M | 0.67 % | MWTIX Metropolitan West Total Return Bd I | 0.44 % | 52% |
| LCEAX Invesco Diversified Dividend A | 0.82 % | LCEFX Invesco Diversified Dividend R6 | 0.42 % | 95% |
| JSMGX Janus Henderson Triton I | 0.76 % | JGMNX Janus Henderson Triton N | 0.66 % | 15% |
| NMCIX Voya MidCap Opportunities I | 0.96 % | IMOZX Voya MidCap Opportunities R6 | 0.85 % | 13% |
| VIGAX Vanguard Growth Index Admiral | 0.05 % | VIGIX Vanguard Growth Index Institutional | 0.04 % | 25% |
| JVMIX JHancock Disciplined Value Mid Cap I | 0.86 % | JVMRX JHancock Disciplined Value Mid Cap R6 | 0.76 % | 13% |
| PSOPX JPMorgan Small Cap Value I | 0.99 % | JSVRX JPMorgan Small Cap Value R5 | 0.86 % | 15% |
| TRRIX T. Rowe Price Retirement Balanced | 0.50% | TRPTX T. Rowe Retirement Balanced I | 0.35% | 43% |

94.     In addition to the mutual funds listed in the chart above, from 2013 to 2018, the Plan retained a lineup of mutual funds commonly referred to as target date funds. According to the Financial Industry Regulatory Authority, known as FINRA, "target-date funds are offered by

24

nearly 90 percent of employer-sponsored defined contribution plans, such as 401(k) plans.[14]"

95.     FINRA goes on to describe target date funds as being tailored to each individuals projected retirement year. According to FINRA "[t]arget-date funds are designed to help manage investment risk. You pick a fund with a target year that is closest to the year you anticipate retiring, say a '2050 Fund.' As you move toward your retirement "target date," the fund gradually reduces risk by changing the investments within the fund." *Id.*

96.     Target date funds are sold as a package with the minimum investment amount referring to the total amount invested across all target date funds. In early 2018, for example, the Plan had twelve T. Rowe Price Retirement target date mutual funds ranging from an expected retirement date of 2005 to 2060 at five-year intervals. A minimum needed to qualify refers to the total of all assets held in all of the 12 funds collectively. Looking at 2017, the Plan had over $136 million dollars invested in target date funds.

97.     However, similar to the arguments made above regarding non-target date mutual funds, the Plan's target date funds were not in the lowest share class and, thus, were much more expensive than necessary. During the Class Period, I shares, commonly known as investor class shares, were available. As of 2020, the I shares had a minimum investment amount of only 1 million dollars across all target date funds.[15] As discussed above, the Plan had invested more than 136 million in target dates funds in 2017 and had invested 76 million dollars in the same funds in 2015. The chart below illustrates the losses Plan participants incurred due to the Defendants'

---

[14] Target Date Funds – Find the Right Target for You published on FINRA's website and available at https://www.finra.org/investors/learn-to-invest/types-investments/retirement/target-date-funds-find-right-target-you. Last accessed on March 16, 2021.

[15] See the full prospectus for the T. Rowe Price target date funds available at https://www.troweprice.com/literature/public/country/us/language/en/literature-type/prospectus/sub-type/mf?productCode=RDI&currency=USD at 30 indicating the minimum investment amount for the I Class is 1 million but that "minimum is generally waived for retirement plans … ." *Id.*

failure to move the Plan's target date funds to a lower share class, the investor class.

| 2018 Target Date Fund[16] | ER | Less Expensive Share Class | Less Expensive ER | Excess Cost |
|---|---|---|---|---|
| TRRDX T. Rowe Price Retirement 2040 | 0.70 % | TRPDX T. Rowe Price Retirement I 2040 I | 0.51 % | 37% |
| TRRCX T. Rowe Price Retirement 2030 | 0.65 % | TRPCX T. Rowe Price Retirement I 2030 I | 0.49 % | 33% |
| TRRMX T. Rowe Price Retirement 2050 | 0.71 % | TRPMX T. Rowe Price Retirement I 2050 I | 0.52 % | 37% |
| TRRJX T. Rowe Price Retirement 2035 | 0.68 % | TRPJX T. Rowe Price Retirement I 2035 I | 0.50 % | 36% |
| TRRKX T. Rowe Price Retirement 2045 | 0.71 % | TRPKX T. Rowe Price Retirement I 2045 I | 0.52 % | 37% |
| TRRBX T. Rowe Price Retirement 2020 | 0.58 % | TRBRX T. Rowe Price Retirement I 2020 I | 0.43 % | 35% |
| TRRHX T. Rowe Price Retirement 2025 | 0.62 % | TRPHX T. Rowe Price Retirement I 2025 I | 0.47 % | 32% |
| TRRNX T. Rowe Price Retirement 2055 | 0.71 % | TRPNX T. Rowe Price Retirement 2055 I | 0.52% | 37% |
| TRRLX T. Rowe Price Retirement 2060 | 0.71 % | TRPLX T. Rowe Price Retirement 2060 I | 0.52% | 37% |
| TRRAX T. Rowe Price Retirement 2010 | 0.52 % | TRPAX T. Rowe Price Retirement I 2010 I | 0.37 % | 41% |
| TRRGX T. Rowe Price Retirement 2015 | 0.55 % | TRFGX T. Rowe Price Retirement I 2015 I | 0.40 % | 37% |

[16] In early 2018, the Plan moved its target date suite of funds to the CIT version of the same fund. This move was too little too late as the damages to plan participants had already been baked in.

| 2018 Target Date Fund[16] | ER | Less Expensive Share Class | Less Expensive ER | Excess Cost |
|---|---|---|---|---|
| TRRFX<br>T. Rowe Price Retirement 2005 | 0.52 % | TRPFX<br>T. Rowe Price Retirement 2005 I | 0.37% | 41% |

98.     The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

99.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

100.     In other words, given the size of the Plan, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduced the likelihood that Plan participants would achieve their preferred lifestyle in retirement.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

101.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

102.   At all relevant times, the Committee Defendants and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

103.   As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

104.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to control the administrative and recordkeeping expenses of the Plan and to investigate the availability of lower-cost identical products of certain mutual funds in the Plan.

105.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

106.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must

restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

107.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Board and ICON)

108.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

109.    The Board Defendants and ICON (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

110.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

111.    The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

112.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)    failing to monitor the processes by which the Plan's investments were evaluated and the Committee's failure to investigate the availability of identical lower-cost funds; and

(c)    failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

113.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

114.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.       A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.       Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.       A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.       An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.       An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.       Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.       An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: March 26, 2021                    **CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey
Donald R. Reavey, Esquire
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class